# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CITY OF MERCED REDEVELOPMENT AGENCY,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**EXXON MOBIL CORP., et al.,**<br><br>**Defendants.** | **1:08-cv-714-LJO-GSA**<br><br>**MEMORANDUM DECISION AND ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT (Docs. 74, 79, 82).** |

## I. INTRODUCTION

This case is about who bears the costs associated with the clean-up of contamination in the City of Merced, California ("the City") caused by methyl tertiary butyl ether ("MTBE[1]") released from two gasoline service stations located at 1415 R Street and 1455 R Street ("the R Street stations") in the City. Plaintiff City of Merced Redevelopment Agency ("the RDA"), a successor agency to Merced Designated Local Authority ("the DLA") (collectively, "Plaintiff[2]"), seeks to recover from Defendants[3] the costs it incurred remediating that groundwater contamination, and also seeks to establish

---

[1] MTBE is an oxygenate added to gasoline to reduce gasoline emissions. *Oxygenated Fuels Ass'n, Inc. v. Davis*, 331 F.3d 665, 666 (9th Cir. 2003). The State of California banned the use of MTBE as a fuel additive in 1999 because it "causes substantial and deleterious groundwater pollution." *Id.* at 667 (citing Cal. Code Regs. tit. 13, § 2262.6).

[2] The DLA is the successor agency to the RDA. As Defendants correctly explain:

> The California Legislature dissolved all redevelopment agencies in 2011. In *Cal. Redev. Ass'n v. Matosantos*, 53 Cal.4th 231 (2011), the California Supreme Court upheld the constitutionality of that legislation and established February 1, 2012, as the dissolution date for all redevelopment agencies. The City of Merced RDA obtained leave to substitute the Merced Designated Local Authority as the plaintiff in this case in its purported capacity as the successor-in-interest to the Merced RDA.

Doc. 83 at 7 n.1. Thus, the parties effectively refer to the DLA and the RDA interchangeably. All references to "Plaintiff" therefore refer to both the RDA and DLA unless otherwise indicated.

[3] Defendants are Shell Oil Company ("Shell"), Chevron U.S.A., Inc. ("Chevron"), Exxon Mobil Corp., ("Exxon"), Equilon Enterprises, LLC, Equilon Enterprises LLC, SFPP, L.P. (collectively, "Equilon"), Tesoro Corp., Tesoro Refining and Marketing Co. (collectively, "Tesoro"), and Conocophillips Corp.

1  Defendants' liability for any future remediation costs. *See* Doc. 75 at 2.

2       In 2005, the City brought suit against various defendants, including Exxon,[4] Shell, Equilon, and

3  Chevron, in California state court ("the *City of Merced* case") for "contamination of [the City's] public

4  water supply by gasoline containing MTBE." Doc. 77, Declaration of Tracey O'Reilly ("O'Reilly

5  Decl."), Ex. 1 ("*City of Merced* Compl."). The case resolved through summary judgment motions and,

6  ultimately, an approximately four-month jury trial. *See* O'Reilly Decl., Exs. 2, 3.

7       Currently before the Court are Plaintiff's motion for partial summary judgment (Doc. 74), a

8  motion for summary judgment brought by all Defendants (Doc. 79), and a separate motion for summary

9  judgment brought by only Defendants Shell and Equilon (collectively, "the Shell Defendants") (Doc.

10  82). The Court did not set a hearing for the motions and the parties did not request one. The Court finds

11  it appropriate to rule on the motions without oral argument. *See* Local Rule 230(g). For the following

12  reasons, the Court GRANTS IN PART Defendants' motion for summary judgment (Doc. 79) and

13  DENIES AS MOOT the remainder of the parties' motions for summary judgment.

14             **II. FACTUAL AND PROCEDURAL BACKGROUND**

15  **A. Undisputed Facts.[5]**

16      **1.    Remediation at the R Street Stations.**

17       The RDA purchased the R Street stations in the early 1990s. Doc. 108, Reply to Plaintiff's

18  Opposition Facts and Opposition to Plaintiff's Affirmative Statement of Facts ("UF[6]"), UF 93-94. The R

19  Street stations are within the Merced Redevelopment Project Area ("the project area"). UF 41. Plaintiff

20

21  ――――――――――

[4] "Exxon Corp." was Exxon Mobil Corp.'s former name. *See* Doc. 81 at 5, ¶¶ 15-16.

22  [5] The following facts are undisputed (or not credibly disputed) by the parties, and are supported by competent evidence. The

23  Court has considered the entire record (including the parties' objections and responses thereto), but will discuss only the facts, issues, and arguments necessary to resolve the parties' motions.

24  [6] References to "UF" are to the parties' enumerated undisputed facts as outlined in Defendants' reply to Plaintiff's opposition facts and opposition to Plaintiff's affirmative statement of facts (Doc. 108, "the parties' Statement of Facts"). Although the

25  Court has considered the entire record, the Court finds that this filing (and its referenced evidence) provides the information necessary to resolve the parties' motions for summary judgment. Accordingly, the Court draws primarily from the

26  submission for the following recitation of the facts.

1    was charged with the responsibility of maintaining and rehabilitating the project area. *See* Doc. 76 at ¶¶

2    13-14.

3          Gasoline containing MTBE was released from various gasoline delivery systems in the City. *Id.*

4    That gasoline eventually traveled to and contaminated the project area. *Id.*

5    In 1996, the RDA received a directive from the Department of Public Health for Merced County,
     the regulator of the cleanup site [near the R Street stations], to "include MTBE in the chemicals
6    tested for in the next groundwater monitoring event." Tests following this directive detected
     MTBE at the site, and the RDA knew that MTBE was concentrated in a plume near the R Street
7    Stations that was traveling North along R Street in the groundwater towards the Project Area. By
     the time MTBE was discovered at the R Street Stations, the RDA was authorized to proceed with
8    remediation and was incurring costs and expenses supervising the cleanup.

9    *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.*, 980 F. Supp. 2d 417, 421 (S.D.N.Y.

10   2013) ("*In re MTBE*") (citations omitted). Thus, "[i]t is undisputed that the RDA began incurring costs

11   for MTBE clean-up as early as 1996, and was actively remediating MTBE contamination at the R Street

12   Stations by and before 2002." *Id.* at 424.

13         Since then, Plaintiff has pursued numerous investigations and remediation efforts concerning

14   contamination on the R Street stations. *See* UF 95-104. In doing so, Plaintiff has incurred substantial

15   costs at its own expense. UF 104. This case, however, concerns only the costs Plaintiff incurred that are

16   associated with efforts to remediate MTBE releases at the R Street stations since 2006. *See* UF 104

17   (citing FAC at ¶ 3); *see also* FAC at ¶ 28 (Plaintiff seeks damages "for past, present, and future

18   remediation, and/or investigation costs incurred in or after August 2006")).

19         **2.    *City of Merced*.**

20         In the *City of Merced* case, the City alleged four causes of action against Chevron, Shell,

21   Equilon, and Exxon (among other defendants[7]) for (1) failure to warn; (2) negligence; (3) trespass; and

22   (4) nuisance. *See City of Merced* Compl. at 1. The City alleged that the defendants were liable for its

23   claims for, among other things, their involvement in the release of MTBE-containing gasoline at the R

24   _____

25   [7] The City did not assert claims against Tesoro.

26                                          3

1  Street stations and the resultant damages to the City's property, namely, its water systems. *See id.* at ¶¶

2  2-3.

3          The defendants successfully moved for summary judgment on the City's nuisance claim. *See*

4  Doc. 84-3, Ruling on Defendants' Motions for Summary Judgment and Summary Adjudication ("the

5  MSJ Ruling"), at 9. The court found that it could decide the defendants' motion "by determining

6  whether [the City] has proved affirmative conduct by a specific Defendant in creating or assisting in the

7  creation of the alleged nuisance at a specific site." *Id.* The court found that the City failed to do so. *Id.*

8  The court reasoned that "[j]ust placing a defective product in the stream of commerce without an

9  adequate warning is not enough to prove a nuisance" because "[a] more direct nexus between the

10  defendant and the alleged injury is required." *Id.* (citing *City of Modesto Redevelopment Agency v.*

11  *Superior Court*, 119 Cal. App. 4th 28 (2004) ("*City of Modesto*")).

12          The court found that the defendants "operated refineries and terminals that may have supplied

13  gasoline containing MTBE to third party jobbers" at the 1455 R Street station. *See id.* at 10; *id.* at 10 n.5.

14  The court also found "some of the defendants allegedly owned the sites or the [underground storage

15  tanks ("USTs")]" at the 1415 R Street station, but "the actual operation [at both stations] was by third

16  parties." *Id.*

17          The court held:

18     Under California law, this type of alleged conduct is not sufficient for defendants to be liable for
       nuisance and trespass claims as to any of the sites. Rather, Plaintiff must show a defendant either
19     affirmatively instructed the gas station operation to dispose of the MTBE in an improper or
       unlawful manner or show the defendant manufactured or installed the disposal system . . . . There
20     is no showing in this case that defendants' conduct in causing any contamination was active,
       affirmative or knowing as required by law. Plaintiff asserts the allegations in the complaint
21     regarding representations allegedly made by the defendants that the gasoline was safe and
       promoting its use along with their supplying the defective product are sufficient to allow them to
22     proceed on their nuisance claims. This court disagrees. Those allegations are not tied to a
       specific Defendant or site, and at the summary judgment stage are not sufficient to support these
23     causes of action.

24     In this case, similar to some of the defendants in *City of Modesto*, the Defendants supplied the
       defective product without warning of its dangers or how to properly dispose of it, but that failure
25     to warn was not an activity directly connected with leakage or disposal of the MTBE gas.

26
                                                      4

1    *Id.* For this reason, the court held that the City's nuisance claim failed. *See id.* Accordingly, the court

2    granted the defendants summary judgment on their nuisance claim. *Id.*

3              The case proceeded to trial on the City's strict liability claim. UF 28; O'Reilly Decl., Ex 2.

4    Following the close of the City's case, the court granted Shell's motion for nonsuit as to the 1455 R

5    Street station on the ground that there was no evidence that Shell gasoline had been delivered to the

6    station. *See* UF 28.

7              The court instructed the jury that, "[t]o make a claim against a particular Defendant for a

8    particular service station site, the City must prove . . . that gasoline containing MTBE refined,

9    distributed, or sold by the particular Defendant was sold and delivered to the particular service station."

10   O'Reilly Decl., Ex. 6 at 1. On February 9, 2012, the jury returned its special verdict.[8] Doc. 87, Ex. 22;

11   *see also* O'Reilly Decl., Ex. 3 at 8, 11, 17. The court entered judgment on the jury's special verdict

12   based on the merits. Doc. 87, Ex. 23; *see also* UF 31-32. The judgment was fully satisfied, and there are

13   no pending appeals in the case. UF 32-33.

14   **B.     Stipulated Facts.**

15             The parties stipulate to the following facts:

16   • Plaintiff asserts claims concerning the 1415 R Street station against Exxon, Shell, and Equilon
       only.

17
18   • Plaintiff asserts claims concerning the 1455 R Street station against Chevron and Tesoro.

19   • None of the Defendants owned the 1455 R Street station.

20   • Mobil Oil Corp. sold 1415 R Street in 1984 to private individuals, who then sold to other private
       individuals in 1995, who have held a 100% ownership interest since then.

21   • The R Street stations are within the project area.

22   • The jury in *City of Merced* found: (1) gasoline containing MTBE was spilled or leaked from the
       R Street stations; (2) gasoline containing MTBE refined, distributed or sold by Chevron was

23     delivered to 1455 R Street and was spilled or leaked from that station; (3) gasoline containing

24     MTBE refined, distributed or sold by Exxon was delivered to 1415 R Street and was spilled or

25   ───────────────
     [8] Due to the Court's resolution of the parties' motions, the specifics of the *City of Merced*'s jury verdict are not relevant.

26

1    leaked from that station.

2    Doc. 86, Ex. 2, Stipulation of Facts ("Stip. of Facts"), at 14-15.

3    **C.      This Case.**

4            Plaintiff filed this case in the Superior Court for the County of Merced on April 7, 2008. Doc. 87,

5    Ex. 25 at 1. Plaintiffs alleged five causes of action against Defendants for (1) cost recovery under the

6    Polanco Redevelopment Act, Cal. Health & Safety Code §§ 33459-33459.8 ("the Polanco Act"); (2)

7    products liability; (3) negligence; (4) trespass; and (5) nuisance. *Id.* Defendants removed the case to this

8    Court on May 21, 2008, pursuant to § 1503 of the Energy Policy Act of 2005, Pub. L. No. 109-58, 119

9    Stat. 594 (codified in various sections of Titles 16 and 42 of the United States Code) (Doc. 2 at 1),

10   which provides that "claims and legal actions . . . related to allegations involving actual or threatened

11   contamination of [MTBE] may be removed to the appropriate United States district court." Plaintiffs do

12   not dispute that Defendants' removal to this Court was appropriate.

13           On July 11, 2008, the case was transferred to the United State District Court for the Southern

14   District of New York as part of a multidistrict litigation, MDL No. 1358, *In re Methyl Tertiary Butyl*

15   *Ether ("MTBE") Prods. Liability Litig.* ("the MDL case"). *See* Doc. 26. On March 4, 2013, Plaintiff

16   filed a First Amended Complaint ("the FAC")—currently the operative complaint—in the MDL in order

17   to substitute the DLA as the plaintiff. O'Reilly Decl., Ex. 26. Plaintiff alleged the same five causes of

18   action as in its original complaint. *Id.*; *see also In re MTBE*, 980 F. Supp. 2d at 419.

19           In 2013, Defendants moved for summary judgment on all of Plaintiff's claims except its Polanco

20   Act claim on the ground that they were barred by the applicable statute of limitations. *See id.* In August

21   2013, the MDL court granted Defendants' motion for summary judgment on all of Plaintiff's claims

22   (except their Polanco Act claim) on the ground they were time-barred. *Id.* The MDL court further found

23   that "[b]ecause the limitations issue also precludes [Plaintiff's] claims of nuisance and trespass,

24   Defendants' motion on those grounds is MOOT." *Id.* Thus, the MDL court did not reach the merits of

25   those claims.

26

1    On March 7, 2014, the MDL court transferred the case back to this Court. *See* Doc. 29 at 1.

2    Accordingly, the only claim currently pending before the Court is Plaintiff's Polanco Act claim.

3            a.      **Plaintiff's Polanco Act Claim.**

4            Under California law, Plaintiff is entitled to rehabilitate and clean up blighted property in areas

5    known as "redevelopment projects." *See generally* Cal. Health & Safety Code § 33131(a) (California

6    redevelopment agencies are authorized to "prepare and carry out plans for the improvement,

7    rehabilitation, and redevelopment of blighted areas"). The Polanco Act provides, in part, that California

8    redevelopment agencies, such as Plaintiff, may pursue "responsible parties" to recover the costs incurred

9    in remediating contamination within a redevelopment area. *See* Cal. Health & Safety Code § 33459.4(a)

10   ("any responsible party or parties shall be liable to the redevelopment agency for the costs incurred in

11   the [remediation] action").

12           The R Street stations are within the project area, Stip. of Facts at 1, and Plaintiff was charged

13   with its remediation. FAC at ¶ 1. Plaintiff alleges that Defendants are liable for the release of MTBE-

14   containing gas from the R Street stations. *See id.* at 7-8. Plaintiff claims that, "[a]s a direct result of the

15   Defendants' acts . . . the project area, including soil, groundwater, and improvements, has been

16   contaminated, and will continue to be contaminated with . . . MTBE . . . which create a public health

17   hazard unless abated." *Id.* at ¶ 34. In response, Plaintiff  "initiate[d] a . . . program" to remediate the

18   "contamination in the project area and to restore the project area at significant expense, loss, and

19   damages." *Id.* Plaintiff asserts that, to date, it has "expended more than $5 million . . . in remediating

20   MTBE from the R Street Stations," which it "seeks to recover . . . pursuant to [the Polanco Act], which

21   provides a statutory cause of action not available to the City." Doc. 75 at 2-3. In sum, Plaintiff's Polanco

22   Act claim seeks to recoup the costs Plaintiff has incurred in remediating the damage caused by MTBE-

23   containing gasoline released from the R Street stations.

24           b.      **Plaintiff's Motion for Partial Summary Judgment.**

25           Plaintiff does not move for summary judgment on its Polanco Act claim. Rather, Plaintiff moves

26

7

1   for partial summary judgment that Defendants "are collaterally estopped from disputing facts

2   determined in the *City of Merced* special verdict." Doc. 75 at 2. Specifically, Plaintiff seeks to preclude

3   Defendants "from arguing that their MTBE gasoline was *not* released from the R Street Stations." *Id.* at

4   8 (emphasis in original). Plaintiff requests that the Court find that, due to the jury's findings in *City of*

5   *Merced*, a series of facts are now beyond dispute. *See* Doc. 78 at 2 (collectively, "Plaintiff's proposed

6   facts"). Exxon and Chevron opposed Plaintiff's motion for summary judgment. *See* Doc. 96.

7           c.      **Defendants' Motion for Summary Judgment.**

8           Defendants move for summary judgment on Plaintiff's Polanco Act claim. Doc. 80 at 7.

9   Defendants argue that they are entitled to summary judgment for two reasons: (1) Defendants are not

10  "responsible parties" under the Polanco Act, *id.* at 16, and (2) the RDA failed to provide proper notice to

11  Defendants of its remediation efforts, as required under the Polanco Act. *Id.* at 25.

12          Defendants assert that, "[u]nder the Polanco Act, only those who took affirmative steps that

13  caused contamination are liable [*i.e.*, are 'responsible parties'], and here, the undisputed facts clearly

14  prove, Defendants took no such actions." *Id.* Defendants maintain they "did not own or operate the

15  gasoline stations at issue, did not instruct the owners or operators to release MTBE gasoline into the

16  environment, and did nothing else to cause the release of MTBE gasoline at these stations." *Id.*

17  Accordingly, Defendants assert they are not "responsible parties" under the Polanco Act and, therefore,

18  are not liable for the project area's remediation costs incurred by Plaintiff. *Id.*

19          Defendants argue that, in any event, Plaintiff "lacks statutory authority to require any alleged

20  responsible parties pay for the remediation" because Plaintiff failed to comply with the Polanco Act's

21  notice requirements. *Id.* at 25-26. Specifically, Defendants assert that Plaintiff failed to comply with the

22  Polanco Act's requirement that "a redevelopment agency provide all responsible parties with notice at

23  least 60 days *before* implementing a remedial action plan." *Id.* at 25 (emphasis in original) (citing Cal.

24  Health & Safety Code § 33459.1(b)(2); *Redevelopment Agency of the City of San Diego v. Salvation*

25  *Army*, 103 Cal. App. 4th 755, 759, 771-72 (2002)).

26

1    Plaintiff contends that Defendants are "responsible parties" under the Polanco Act because of

2    their involvement in the creation of a nuisance—the release of MTBE-containing gasoline—at the R

3    Street stations. Doc. 101 at 16-22. Plaintiff also contends that the DLA in fact gave notice to Defendants

4    in compliance with the Polanco Act's notice requirements. *Id.* at 26. Further, Plaintiff argues that, even

5    if the DLA did not give proper notice to Defendants, Defendants "waived their notice argument." *Id.* at

6    27.

7                    **d.      The Shell Defendants' Motion for Summary Judgment.**

8            The Shell Defendants move for summary judgment on Plaintiff's Polanco Act claim. Doc. 83 at

9    7-8. The Shell Defendants argue that, based on *City of Merced*, they cannot be liable on the claim. *See*

10   *id.* According to the Shell Defendants, Plaintiff's Polanco Act claim is premised on a finding that Shell

11   gasoline was released at the R Street stations. *Id.* at 16. But, because "Shell was exonerated of all

12   culpability for releases of MTBE gasoline at both R Street service stations" by the *City of Merced* jury,

13   the Shell Defendants argue that Plaintiff is precluded from re-litigating the issue of whether Shell

14   gasoline was released at the R Street stations. *Id.* at 7. According to the Shell Defendants, the *City of*

15   *Merced* jury's findings preclude a finding that they are "responsible parties" under the Polanco Act and,

16   therefore, *res judicata* bars Plaintiff's claim. *Id.* at 6.

17           Plaintiff opposed the Shell Defendants' motion for summary judgment for four primary reasons.

18   Doc. 93 at 5.

19       First, there is no privity between [the DLA] and [the City], who was the sole plaintiff in [*City of*
         *Merced*] . . . . Second, [the City] could not have prosecuted in *City of Merced* the Polanco Act
20       claim being pursued by the DLA in the instant case. Third, the injuries suffered and the relief
         sought by the DLA are different than the injuries suffered and the relief sought by [the City] in
21       *City of Merced*. Fourth, the DLA's claims involve factual issues not involved in—and therefore
         not litigated in—*City of Merced*.

22   *Id.* Plaintiff also asserts that the Shell Defendants waived their *res judicata* argument because they failed

23   to plead it as an affirmative defense. *Id.* at 23.[9]

24
     _____

25
     [9] Plaintiff argues that summary judgment motions at this stage are improper because Judge Scheindlin, who is presiding over

26
                                                          9

### III. <u>STANDARD OF DECISION</u>

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the case under the applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable trier of fact could return a verdict in favor of the nonmoving party." *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *Cecala v. Newman*, 532 F. Supp. 2d 1118, 1132 (D. Ariz. 2007). If the movant will have the burden of proof at trial, it must demonstrate, with affirmative evidence, that "no reasonable trier of fact could find other than for the moving party." *Soremekun*, 509 F.3d at 984. In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.* (citing *Celotex*, 477 U.S. at 323).

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting *affirmative evidence* from which a

---

the MDL, "required all summary motions to be filed in the MDL and Shell's failure to file this motion in a timely manner before the MDL should preclude the Shell defendants from seeking judgment now." Doc. 93 at 23 n.9. Plaintiff provides no authority or record support for this argument. Accordingly, the Court rejects Plaintiff's argument that the parties' summary judgment motions are improper.

1  jury could find in [its] favor." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in

2  original). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard. *Id.* at 929; *see*

3  *also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the

4  moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that

5  there is some metaphysical doubt as to the material facts.") (citation omitted). "Where the record as a

6  whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue

7  for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S.

8  253, 289 (1968)).

9      In resolving a summary judgment motion, "the court does not make credibility determinations or

10  weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. That remains the province of the jury or fact

11  finder. *See Anderson*, 477 U.S. at 255. Instead, "[t]he evidence of the [nonmoving party] is to be

12  believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* Inferences, however, are not

13  drawn out of the air; the nonmoving party must produce a factual predicate from which the inference

14  may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal.

15  1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

16  ## IV. <u>ANALYSIS</u>

17      To succeed on a Polanco Act claim, a plaintiff must establish:

18  (1) the property is located within a redevelopment project area (Health & Saf. Code, § 33459.1,
    subd. (a)(1)); (2) the presence of a release of a hazardous substance within the project area

19  (*ibid.*); (3) reimbursement is sought from a defendant who is a "[r]esponsible party" (*id.*, §
    33459, subd. (h)); (4) the redevelopment agency has provided the responsible party with a 60–

20  day notice requesting a remedial action plan for the property (*id.*, § 33459.1, subd. (b)(2)); (5)
    the responsible party failed to submit a remedial action plan or failed to submit a plan the

21  redevelopment agency could approve (*ibid.*); (6) the redevelopment agency reached agreement
    on a remedial action plan with a regulatory agency overseeing the redevelopment project (*id.*, §

22  33459.1, subd. (a)(1)); and (7) the redevelopment agency incurred costs to remedy or remove the
    hazardous substance as necessary to implement the approved plan (*id.*, § 33459.4, subds. (a) &

23  (c)).

24  *Salvation Army*, 103 Cal. App. 4th at 765. At issue in this case is whether Defendants are "responsible

25  parties" and whether Plaintiff provided them with appropriate notice of its remedial action plan at the R

26

1   Street stations.

2   **A.    Whether Plaintiff Gave Adequate Notice Under the Polanco Act.**

3          As a threshold matter, Defendants argue that they are entitled to summary judgment because

4   Plaintiff failed to comply with the Polanco Act's notice requirements. Doc. 80 at 25. Defendants assert

5   that Plaintiff's failure to comply with this notice requirement renders Plaintiff without statutory

6   authority to bring its claim and, thus, this Court has no jurisdiction over the claim. *See id.* at 25-26.

7          Defendants do not provide—and the Court is unaware of—any case holding that the Polanco

8   Act's 60-day notice requirement (Cal. Health & Safety Code §§ 33459.1(a)(1) & (b)(2)) is jurisdictional.

9   In *Salvation Army*, 103 Cal. App. 4th at 765, the court indicated that the notice requirement is one of

10  seven elements that a plaintiff must satisfy to prevail on a Polanco Act claim. Although the court

11  described the notice requirement as a "condition precedent" that a plaintiff must satisfy to recover on

12  Polanco Act claim, *id.* at 771-72, the court did not indicate that the notice requirements must be satisfied

13  before a court has jurisdiction over a Polanco Act claim. *See id.* Rather, a plaintiff's failure to comply

14  with the notice requirements may preclude the plaintiff's recover under the Polanco Act. *See id.*; *see*

15  *also Anaheim Redevelopment Agency v. Union Pac. R.R. Co.*, No. G028913, 2003 WL 21310576, at *7

16  (Cal. Ct. App. June 9, 2003) (holding that because the plaintiff "failed to comply with the notification

17  requirements of the [Polanco] Act . . . [it] was thus not entitled to recover damages pursuant to the

18  [Polanco] Act").

19         Accordingly, the Court does not find that the Polanco Act's notice provisions are jurisdictional.

20  Furthermore, because Plaintiff's Polanco Act claim fails on other grounds, the Court need not decide

21  whether Plaintiff provided Defendants adequate notice under the Polanco Act.

22  **B.    Whether Defendants Are "Responsible Parties" Under the Polanco Act.**

23         The Court first addresses the issue of whether Defendants are "responsible parties" under the

24  Polanco Act because Defendants' liability for Plaintiff's Polanco Act claim hinges on that

25  determination. If Defendants are not "responsible parties" under the Polanco Act, then Plaintiff's claim

26

1    fails, Defendants are entitled to summary judgment on the claim, and the remainder of the parties'

2    motions for summary judgment is moot.

3        **1. Standards**

4            **a. Polanco Act.**

5        The court in *City of Modesto* explained the Polanco Act's definition of a "responsible party" as

6    follows:

7        The Polanco Act defines a "'[r]esponsible party'" as "any person described in subdivision (a)
         of Section 25323.5 of [the Health and Safety] Code or subdivision (a) of Section 13304 of the
8        Water Code." (Health & Saf. Code, § 33459, subd. (h).) Health and Safety Code section 25323.5
         defines responsible parties as those described as covered persons in the Comprehensive
9        Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (42 U.S.C. §
         9607(a)).

10   119 Cal. App. 4th at 34. Thus, the Polanco Act provides that a defendant may be liable for remediation

11   costs under the Polanco Act if it is a "responsible party" under 42 U.S.C. § 9607(a) ("§ 9607(a)") or §

12   13304(a) of the California Water Code ("§ 13304(a)").

13           **b. CERCLA.**

14       Section 9607(a) enumerates four categories of "covered persons" who may be liable under the

15   Act, and thus may be liable as "responsible parties" on a Polanco Act claim. *See* 42 U.S.C. § 9607(a)(1)-

16   (4); *City of Modesto*, 119 Cal. App. 4th at 34. Plaintiff argues that Defendants are liable under §

17   9607(a)(3) only.[10] Section 9607(a)(3) provides that the following are covered persons:

18       any person who by contract, agreement, or otherwise arranged for disposal or treatment, or
19       arranged with a transporter for transport for disposal or treatment, of hazardous substances
         owned or possessed by such person, by any other party or entity, at any facility or incineration
20       vessel owned or operated by another party or entity and containing such hazardous substances.

21   ─────────────────────

22   [10] Based on the FAC, Plaintiff's motion for summary judgment, and Plaintiff's oppositions to Defendants' motions for
     summary judgment, the Court could not discern whether or on what basis Plaintiff was proceeding on a theory that
     Defendants are "responsible parties" under CERCLA. *See* Doc. 115 at 2. The Court therefore ordered Plaintiff to file a
23   supplemental brief explaining its position on whether Defendants are liable for Plaintiff's Polanco Act claim on the ground
     they are responsible parties under CERCLA. *Id.* Plaintiff was directed to answer four specific questions pertaining to the
     nature of its CERCLA claim, including but not limited to the provision(s) of § 9607(a) on which Plaintiff bases its claim. *Id.*
24   at 2. Plaintiff timely complied with the Court's order (Doc. 116), but did not clearly answer the Court's questions, so the
     Court again is left with some ambiguity concerning Plaintiff's CERCLA claim. Among other things, Plaintiff did not
25   explicitly state its position as to the provision(s) of § 9607(a) on which it bases its claim, but it appears to argue Defendants
     are liable as "arrangers" as contemplated by § 9607(a)(3). *See id.* at 2 (Plaintiff arguing the evidence shows "defendants meet
26   the CERCLA definition of 'arranger,' and are therefore responsible parties under the CERCLA prong of the Polanco Act").

                                                          13

"Disposal," in turn, means "the discharge, deposit injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3). "For CERCLA purposes, 'disposal' is construed 'as referring only to an affirmative act of discarding a substance as waste, and not to the productive use of the substance.'" *Team Enterprises, LLC v. Western Invest. Real Estate Trust*, 721 F. Supp. 2d 898, 906 (E.D. Cal. 2010), *aff'd*, 446 Fed. App'x 23 (9th Cir. 2011) (quoting *3550 Stevens Creek Assocs. v. Barclays Bank of Calif.*, 915 F.2d 1355, 1362 (9th Cir. 1990)).

"Arranger liability ensures that owners of hazardous substances may not free themselves from liability by selling or otherwise transferring a hazardous substance to another party for the purpose of disposal." *Team Enterprises, LLC v. Western Investment Real Estate Trust*, 647 F.3d 901, 907 (9th Cir. 2011). "Because there are myriad schemes by which a party may 'arrange[ ] for disposal' of a hazardous substance, courts have recognized that determining whether a transaction gives rise to arranger liability is a fact-intensive inquiry." *Id.* (citing *Cal. Dep't of Toxic Substances v. Alco Pac., Inc.*, 508 F.3d 930, 938 (9th Cir. 2007)).

"CERCLA does not specifically define what it means to 'arrang[e]' for disposal of a hazardous substance." *Burlington Northern & Santa Fe Ry. Co. v. United States*, 556 U.S. 559, 610 (2009). The Supreme Court has held, however, that "under the plain language of the statute, an entity may qualify as an arranger under § 9607(a)(3) when it takes *intentional steps to dispose* of a hazardous substance." *Id.* at 611 (emphasis added).

Thus, "to qualify as an arranger" under § 9607(a)(3), a party must have entered into a sale of its product "with the intention that at least a portion of the produce be disposed of during the transfer process by one or more of the methods described in § 6903(a)." *Id.* "[M]ere knowledge that spills and leaks [of a hazardous substance] . . . occur is insufficient grounds for concluding that [a defendant] 'arranged for' the disposal of [a hazardous substance] within the meaning of § 9607(a)(3)." *Id.* at 613. In

14

1   other words, "CERCLA arranger liability is premised upon an intentional act directed toward the

2   disposal of hazardous waste." *Vine Street LLC v. Borg Warner Corp.*, __ F.3d __, 2015 WL 178981, at

3   *4 (5th Cir. Jan. 14, 2015).

4         In *Team Enterprises*, the Ninth Circuit expounded on the "intent requirement" for arranger

5   liability under § 9607(a)(3) and the related "useful product" defense to arranger liability:

6         In light of the intent requirement, we have long recognized the so-called useful product defense
          to CERCLA claims . . . . The defense prevents a seller of a useful product from being subject to
7         arranger liability, even when the product itself is a hazardous substance that requires future
          disposal. In other words, a person may be subject to arranger liability "only if the material in
8         question constitutes 'waste' rather than a useful product."

9         The useful product doctrine serves as a convenient proxy for the intent element because of the
          general presumption that persons selling useful products do so for legitimate business purposes.
10        It would be odd, for example, to say that an auto parts store sells motor oil to car owners *for the
          purpose* of disposing of hazardous waste. Conversely, persons selling or otherwise arranging for
11        the transfer of hazardous waste (which no longer serves any useful purpose) are more likely
          trying to avoid incurring liability that might attach were they to dispose of the hazardous waste
12        themselves. In other words, the probable *purpose* for entering into such a transaction is to
          dispose of hazardous waste.

13  647 F.3d at 908 (emphasis in original) (citations and footnotes omitted).

14

15        Accordingly, "[a] person may be held liable as an 'arranger' under § 9607(a)(3) only if the

16  material in question constitutes 'waste' rather than a 'useful product.'" *Cal. Dep't of Toxic Substances

17  Control*, 508 F.3d at 934 (citations omitted). In the context of summary judgment, whether a party is

18  subject to arranger liability under § 9607(a)(3), "the question . . . is, 'whether the fact-finder could infer

19  from all the circumstances that a transaction in fact involves an arrangement for the disposal or

20  treatment of a hazardous substance.'" *Id.* (quoting *Cadillac Fairview/Calif., Inc. v. United States*, 41

21  F.3d 562, 565 (9th Cir. 1994)).

22        In *Burlington*, for instance, "the Supreme Court held that pesticide manufacturer Shell Oil

23  Company was not an arranger despite its knowledge of pesticide spills during transfers and deliveries,

24  due to equipment failures." *Voggenthaler v. Maryland Square, LLC*, No. 2:08-cv-1618-RCJ-GWF, 2011

25  WL 693267, at *5 (D. Nev. Feb. 4, 2011), *rev'd on other grounds*, 724 F.3d 1050 (9th Cir. 2013). The

26  Supreme Court has explained that

15

1  While it is true that in some instances an entity's knowledge that its product will be leaked,
   spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of
2  its hazardous wastes, knowledge alone is insufficient to prove that an entity "planned for" the
   disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an
3  unused, useful product . . . . In order to qualify as an arranger, [the defendant] must have entered
   into the sale of [its product] with the intention that at least a portion of the product be disposed of
4  during the transfer process by one or more of the methods described in § 6903(3).

5  *Burlington*, 556 U.S. at 612. The disposal of the hazardous substances at issue in *Burlington* occurred

6  "as a peripheral result of the legitimate sale of an unused, useful product." 556 U.S. at 612. Thus, the

7  Court concluded that the purpose of the transactions at issue was to sell useful chemicals, not to dispose

8  of them. *See id.* The defendant's mere knowledge that spills and leaks continued to occur is insufficient

9  grounds for concluding that the defendant "arranged for" the disposal of [a hazardous substance] within

10 the meaning of § 9607(a)(3). *Id.* And because the defendant took steps to reduce the likelihood of spills,

11 the "evidence d[id] not support an inference that [the defendant] intended such spills to occur." *Id.* at

12 612-13. For these reason, the defendant was not an "arranger" under CERCLA. *Id.* at 613.

13       Similarly, in an unpublished decision, the Ninth Circuit affirmed this Court's dismissal of a

14 CERCLA claim premised on the defendants' alleged arranger liability under CERCLA. *See Hinds*

15 *Investments, L.P. v. Angioli*, 455 Fed. App'x 917, 919-20 (9th Cir. 2011). The defendants sold dry

16 cleaning equipment that contained a hazardous substance, which ultimately contaminated the plaintiffs'

17 property. *See id.* at 919; *Hinds Investments, L.P. v. Angioli*, 654 F.3d 846, 848-49 (9th Cir. 2011). The

18 Ninth Circuit affirmed this Court's dismissal because the plaintiffs failed to allege "facts showing that

19 Defendants sold dry cleaning equipment for the purpose of disposing of [a hazardous substance] or that

20 Defendants exercised control over the disposal process." *Hinds*, 445 Fed. App'x at 919.

21       Likewise, in *Team Enterprises*, 647 F.3d at 910-11, the Ninth Circuit affirmed this Court's

22 conclusion that the defendant was not subject to arranger liability under § 9607(a)(3). The court held

23 that

24       to satisfy the intent requirement, a company selling a product that uses and/or generates a
         hazardous substance as part of its operation may not be held liable as an arranger under
25       CERCLA unless the plaintiff proves that the company entered into the relevant transaction *with
         the specific purpose* of disposing of a hazardous substance.

26                                                    16

*Id.* at 908 (emphasis in original). The Ninth Circuit affirmed this Court's conclusion that the plaintiff "failed to present evidence giving rise to a triable issue as to whether [the defendant] sold [the hazardous material-containing product] with such a purpose." *Id.* at 910.

### c. Section 13304(a).

"The Polanco Act imposes liability on parties described in section 13304(a) of the California Water Code," ("§ 13304(a)"). *Redevelopment Agency of City of Stockton v. BNSF Ry. Co.*, 643 F.3d 668, 677 (9th Cir. 2011) ("*City of Stockton*"). Section 13304(a) provides:

> [a]ny person . . . who has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance.

Section 13304(a) "should be construed harmoniously with the law of nuisance." *Id.*; *Wells Fargo Bank, N.A. v. Renz*, 795 F. Supp. 2d 898, 918 (N.D. Cal. 2011) ("The [Porter-Cologne] Act derives from the common law of nuisance."). As such, California nuisance law guides the analysis of whether an individual is a "responsible party" under § 13304(a). *See City of Merced*, 119 Cal. App. 4th at 872 ("Thus, it appears that the Legislature not only did not intend to depart from the law of nuisance, but also explicitly relied on it in the Porter-Cologne Act."); *see also City of Stockton*, 643 F.3d at 672-73.

### d. California Nuisance Law Standards.

"California law defines a nuisance, in part, as '[a]nything which is injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." *City of Stockton*, 643 F.3d at 672-73 (quoting Cal. Civ. Code § 3479). "To qualify as a nuisance 'the interference must be both *substantial* and *unreasonable*.'" *Id.* (quoting *People ex. rel. Gallo v. Acuna*, 14 Cal.4th 1090, 1105 (1997) (emphasis in original)). The parties do not dispute that the release of MTBE-containing gasoline at the R Street Stations caused a nuisance, but they dispute who is liable for its creation or assisting in its creation.

"[L]iability for nuisance does not hinge on whether the defendant owns, possesses, or controls the [nuisance-creating] property, nor on whether [the defendant] is in a position to abate the nuisance;

1   the critical question is whether the defendant created or assisted in the creation of the nuisance." *City of*

2   *Modesto*, 119 Cal. App. 4th at 38 (citation omitted). "Thus, the relevant question for purposes of liability

3   [under § 13304] is 'whether the defendant created or assisted in the creation of the nuisance.'" *Renz*, 795

4   F. Supp. 2d at 918 (quoting *City of Modesto*, 119 Cal. App. 4th at 38).

5           "[E]ven a relatively minor contribution to a discharge may support a finding of responsibility."

6   *City of Modesto*, 119 Cal. App. 4th at 41. "Just as but-for causation is insufficient to impose liability for

7   a nuisance, it is insufficient to impose liability for a discharge under section 13304." *City of Stockton*,

8   643 F.3d at 677. Thus, "[u]nder California law, conduct cannot be said to 'create' a nuisance unless it

9   more actively or knowingly generates or permits the specific nuisance condition." *Id.* at 674. "Such

10  actions, however, must amount to more than simply the manufacture or distribution of the defective

11  product—rather, a defendant must take other 'affirmative acts' that contribute 'directly' to the

12  nuisance." *In re Methyl Tertiary Butyl Ether (MTBE) Prods.*, 457 F. Supp. 2d 455, 463 (S.D.N.Y. 2006).

13          The Ninth Circuit has held that "[a] defendant may be liable for assisting in the creation of a

14  nuisance if he either (1) affirmatively instructs the polluting entity to dispose of hazardous substances in

15  an improper or unlawful manner . . . or (2) manufactures or installs the disposal system." *Team*

16  *Enterprises*, 647 F.3d at 912 (citations omitted). Accordingly, to succeed on a Polanco Act claim based

17  on the assertion that the defendant is a responsible party under § 13304(a), there must be "evidence that

18  [the defendant] actively or knowingly caused or permitted . . . contamination." *City of Stockton*, 643

19  F.3d at 671 (upholding summary judgment for defendants because "[t]here is no evidence that the

20  [defendants] actively or knowingly caused or permitted the contamination as required for nuisance

21  liability and liability under the Polanco Act's Water Code provision."). This is so because "the words

22  'causes or permits' within section 13304 were not intended 'to encompass those whose involvement

23  with a spill was remote and passive.'" *Id.* at 678 (quoting *City of Modesto*, 119 Cal. App. 4th at 44).

24

25

26

18

1      **2. Analysis.**[11]

2              **a. The *City of Merced* MSJ Ruling Has No *Res Judicata* Effect.**

3          The MSJ Ruling is entitled to "full faith and credit" in this Court, *see* 28 U.S.C. § 1728, which

4   requires this Court to give it the same preclusive effect it would have in another California state court.

5   *See Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 525 (1986). Accordingly, the Court first

6   turns to whether the MSJ Ruling has *res judicata* effect here, as Defendants urge. If it does, then it

7   resolves the issue of whether Defendants are liable under § 13304(a) for nuisance.

8                              **(1) Standard.**

9          The Court must apply California law to determine whether the MSJ Ruling precludes Plaintiff's

10  Polanco Act claim. *See Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985). *Res*

11  *judicata* "precludes parties or their privies from relitigating a cause of action that has been finally

12  determined by a court of competent jurisdiction." *Rice v. Crow*, 81 Cal. App. 4th 725, 734 (2000). Under

13  California law, *res judicata* applies where

14          the party to be affected, or some other with whom he is in privity, has litigated, or had an
           opportunity to litigate the same matter in a former action in a court of competent jurisdiction, and
15          should not be permitted to litigate it again to the harassment and vexation of his opponent.

16  *COAST*, 60 Cal. App. 4th at 1065. The elements necessary to establish *res judicata* therefore are: "(1)

17  the decision in the prior proceeding is final and on the merits; (2) the present proceeding is on the same

18  cause of action as the prior proceeding; and (3) the parties in the present proceeding or parties in privity

19  with them were parties to the prior proceeding." *Villacres v. ABM Indus., Inc.*, 189 Cal. App. 4th 562,

20  577 (2010).

21

22  _____

23  [11] As a threshold matter, Plaintiff suggests that the issue of whether Defendants are responsible parties under the Polanco Act
    is properly determined by a finder of fact. *See* Doc. 93 at 19. Plaintiff provides no support for the assertion and, moreover,
24  the Ninth Circuit's decision in *Redevelopment Agency of City of Stockton v. BNSF Ry. Co*, 643 F.3d 668 (9th Cir. 2011)
    directly contradicts the assertion. In that case, the Ninth Circuit affirmed in part district court's grant of summary judgment to
    the defendants on the plaintiff's Polanco Act claim, but reversed the district court's grant of summary judgment to the
25  plaintiff and "remand[ed] for entry of summary judgment to the [defendants]" on the "nuisance and [§ 13304(a)] issues." *Id.*
    at 680. The Ninth Circuit did not indicate that the plaintiff's Polanco Act claim properly was reserved for the finder of fact.

26                                      19

1

**(2) Analysis.**

2

The Court finds that the *City of Merced* MSJ Ruling does not have preclusive effect regarding

3

the issue of whether Defendants are liable for creating or assisting in the creation of a nuisance at the R

4

Street stations.

5

**(a) Judicial Notice and Waiver of *Res Judicata* Defense.**

6

As a preliminary matter, the Court addresses Plaintiff's objection to Defendants' request for

7

judicial notice of the MSJ Ruling (Doc. 94 at 4) and Plaintiff's contention that Defendants waived their

8

*res judicata* argument by failing to plead it as an affirmative defense in their answer. *Id.* at 23.

9

Plaintiff argues that "[j]udicial notice is not proper with respect to *judicial* findings of fact except

10

under limited circumstances not present here." Plaintiff maintains that it "is not appropriate to take

11

judicial notice of the underlying facts discussed in [the MSJ Ruling]." *Id.* at 5. The Shell Defendants do

12

not request that the Court take judicial notice of the facts as found by the court in the MSJ Ruling. *See*

13

Doc. 106 at 2-3. Rather, the Shell Defendants correctly note that this Court may take judicial notice of

14

documents filed in federal and state courts, and only request that the Court take judicial notice of the

15

MSJ Ruling as an undisputed public record. *See* Doc. 106 at 3 (citing *Harris v. Cnty. of Orange*, 682

16

F.3d 1126, 1131-32 (9th Cir. 2012)).  The Court, however, need not resolve the issue. The Court need

17

not (and will not) take judicial notice of the MSJ Ruling to resolve the parties' motions for summary

18

judgment.

19

Plaintiff claims that Defendants waived their *res judicata* argument by failing to plead it as an

20

affirmative defense in their answer. Doc. 93 at 23. Aside from pointing to Fed. R. Civ. P. 8(c), Plaintiff

21

provides no authority for its argument. *See id.* at 23-24.

22

As Defendants correctly point out, however, long-standing Ninth Circuit precedent holds that a

23

defendant may raise an affirmative defense of *res judicata* for the first time in a motion for summary

24

judgment, even if it the defendant did not plead it in an answer. *See* Doc. 105 at 13 (citing *Owens v.*

25

*Kaiser Foundation Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001). The Ninth Circuit holds that

26

20

1   "[a] defendant may . . . raise an affirmative defense for the first time in a motion for judgment on the

2   pleadings, but 'only if the delay does not prejudice the plaintiff.'" *Owens*, 244 F.3d at 713 (quoting

3   *Magana v. Commonwealth of the N. Mariana Islands*, 107 F.3d 1436, 1446 (9th Cir. 1997). In fact, the

4   Ninth Circuit (in an unpublished decision) permitted a defendant to assert a *res judicata* affirmative

5   defense—based on a California state court judgment—at the summary judgment stage, although it was

6   not pled in the defendant's answer. *See McGinest v. GTE Serv. Corp.*, 247 Fed. App'x 72, 74-75 (2007),

7   *cert. denied*, 128 S.Ct. 1226 (2008). The court held that the issue is governed by federal law and, under

8   unequivocal Ninth Circuit precedent, "[a]s long as the plaintiff is not prejudiced, affirmative defenses

9   that were not pleaded in an answer may be raised for the first time on summary judgment." *Id.* at 76

10  (citing *Magana*, 107 F.3d at 1446). Because there was no prejudice to the plaintiff, the Ninth Circuit

11  rejected the plaintiff's argument that the defendant had waived its *res judicata* affirmative defense. *Id.* at

12  75-76.

13      Plaintiff argues in conclusory fashion that it will be prejudiced if Defendants are permitted to

14  assert a *res judicata* affirmative defense at this stage of the litigation, but provides no explanation,

15  argument, or proof for the assertion. *See* Doc. 93 at 24. The fact that Defendants raise their *res judicata*

16  defense at the summary judgment is not sufficient, without more, to establish that Plaintiff will be

17  prejudiced if the Court considers the defense. Accordingly, the Court will allow Defendants to assert

18  their *res judicata* defense contained in their motion for summary judgment.

19                  **(b) Same Cause of Action.**

20      The parties do not (and cannot) dispute that the MSJ Ruling was final and on the merits. *See* UF

21  32-33 (undisputed fact that there are no pending appeals in *City of Merced*). To determine whether the

22  MSJ Ruling has *res judicata* effect here, the Court turns first to whether the City's nuisance claim is the

23  "same cause of action" as Plaintiff's Polanco Act claim.

24                  **(i) Standard.**

25  California courts employ the "primary rights" doctrine to determine whether *res judicata* bars a

26

21

1   claim. *See Manufactured Homes Cmtys., Inc. v. City of San Jose*, 420 F.3d 1022, 1031 (9th Cir. 2005);

2   *Fed'n of Hillside & Canyon Assocs. v. City of Los Angeles*, 126 Cal. App. 4th 1180, 1202 (2004)

3   ("*Hillside*") ("Two proceedings are on the same cause of action if they are based on the same 'primary

4   right.'"). The primary rights doctrine provides:

5       [A] "cause of action" is comprised of a "primary right" of the plaintiff, a corresponding "primary
        duty" of the defendant, and a wrongful act by the defendant constituting a breach of that duty.
6       The most salient characteristic of a primary right is that it is indivisible: the violation of a single
        primary right gives rise to but a single cause of action.

7   *Mycogen Corp. v. Monsanto Co.*, 28 Cal.4th 888, 904 (2002).

8
9       "The plaintiff's primary right is the right to be free from a particular injury, regardless of the

10  legal theory on which liability for the injury is based . . . . The scope of the primary right therefore

11  depends on how the injury is defined." *Hillside*, 126 Cal. App. 4th at 1202. "The plaintiff may seek

12  various remedies based on different legal theories, all arising from a single cause of action." *Bullock v.*

13  *Philip Morris USA, Inc.*, 198 Cal. App. 4th 543, 558 (2011). Thus, "for purposes of applying the

14  doctrine of *res judicata*, the phrase 'cause of action' has a more precise meaning: The cause of action is

15  the right to obtain redress for a harm suffered, regardless of the specific remedy sought or the legal

16  theory (common law or statutory) advanced." *Boeken v. Philip Morris USA, Inc.*, 48 Cal.4th 788, 798

17  (2010). As the California Supreme Court explained:

18      [T]he 'cause of action' is based upon the harm suffered, as opposed to the particular theory
        asserted by the litigant. Even where there are multiple legal theories upon which recovery might
19      be predicated, one injury gives rise to only one claim for relief. 'Hence a judgment for the
        defendant is a bar to a subsequent action by the plaintiff based on the same injury to the same
20      right, even though he presents a different legal ground for relief.' Thus, under the primary rights
        theory, the determinative factor is the harm suffered. When two actions involving the same
21      parties seek compensation for the same harm, they generally involve the same primary right.

22  *Id.* (citations and quotation marks omitted). Thus, "[t]he critical focus of primary rights analysis 'is the

23  harm suffered.'" *Brodheim v. Cry*, 584 F.3d 1262, 1268 (9th Cir. 2009) (quoting *San Diego Police*

24  *Officers' Ass'n v. San Diego City Employees' Retirement Sys.*, 568 F.3d 725, 734 (9th Cir. 2009)).

25  "[T]hat the same facts are involved in both suits is not conclusive." *Agarwal v. Johnson*, 25 Cal.3d 932,

26  954 (1970).

1   Accordingly, to determine whether the MSJ Ruling has preclusive effect on Plaintiff's Polanco

2   Act claim, the Court "must compare the two actions, looking at the rights which are sought to be

3   vindicated and the harm for which redress is claimed." *COAST*, 60 Cal. App. 4th at 1067; *accord City of*

4   *Martinez v. Texaco Trading & Transp., Inc.*, 353 F.3d 758, 762 (9th Cir. 2003) ("To determine if the

5   issues in both actions involve the same primary right, we look to the rights sought to be vindicated and,

6   specifically, to the claimed harm."). Further, the Court must do so "without regard to [the complaints']

7   asserted theories of recovery." *Adams Bros. Farming, Inc. v. Cnty. of Santa Barbara*, 604 F.3d 1142,

8   1149 (9th Cir. 2010).

9   **(ii) Same Primary Right.**

10   In the following cases, the courts found that *res judicata* barred a claim because it concerned the

11   same primary right involved in a prior case in which a final judgment on the merits had entered.

12   In *Acuna v. Regents of Univ. of Calif.*, 55 Cal. App. 4th 639 (1997), the court found that the

13   plaintiff's employment discrimination claims based on California state law were barred due to the

14   plaintiff's prior federal court action in which he asserted similar claims under federal law. The court

15   reasoned that the plaintiff's "claims, whether brought under [federal law] or [California law], arise from

16   the same primary right: the right to be free of invidious employment discrimination." *Id.* at 649.

17   Similarly, in *City of Simi Valley v. Superior Court*, 111 Cal. App. 4th 1077 (2003), the court

18   found that the plaintiff's state law-based suit was barred by *res judicata* due to the plaintiff's prior

19   federal court action. Both cases concerned the plaintiff's allegations that the defendant-police officers'

20   conduct and use of tear gas was unlawful. *Id.* at 1083. "In the federal action, summary judgment was

21   granted on the adverse factual finding that the officers' conduct and use of tear gas was 'objectively

22   reasonable.'" *Id.* In state court, the plaintiff "recast the action based on theories of negligence." *Id.*

23   Relying on *Acuna*, 56 Cal. App. 4th at 639, the court concluded that the federal court's grant of

24   summary judgment against the plaintiff barred the plaintiff's state court negligence action because both

25   were "premised upon violation of the same primary right." *City of Simi Valley*, 111 Cal. App. 4th at 473.

26

1      In *Hillside*, 126 Cal. App. 4th at 1203, the court found that *res judicata* applied where causes of

2      action in two separate proceedings concerned "the same project, the same [environmental impact

3      report], and substantially the same findings." Thus, the material facts ha[d] not changed and . . . the two

4      proceedings involve[d] the same primary right and the same cause of action." *Id.* at 1204.

5      The California Supreme Court found in *Mycogen*, 28 Cal.4th at 904-05, that the plaintiff's two

6      separate lawsuits against the defendant concerned the same primary right. In both suits, the plaintiff

7      "alleged a breach of the same contract [with the defendant], differing only in the requested remedy." *Id.*

8      at 905. Accordingly, the plaintiff's second suit was barred by *res judicata* because both "were based on

9      the violation of the same primary right, [the defendant's] breach of contract." *Id.* at 909 (footnote

10     omitted).

11     Likewise, the California Supreme Court held in *Boeken*, 48 Cal.4th at 791, that the plaintiff's

12    second suit was barred by *res judicata* because it concerned the same primary right at issue in the

13    plaintiff's prior suit against the same defendant. In that case, the plaintiff sued the defendant, a cigarette

14    manufacturer, for loss of consortium due to her husband's smoking-related lung cancer. *Id.* After the

15    case was dismissed with prejudice, the plaintiff's husband died from his lung cancer. *Id.* After he died,

16    the plaintiff filed a wrongful death suit against the defendant. *Id.* The court reasoned that both cases

17    concerned the primary right "not to be wrongfully deprived of spousal companionship and affection,"

18    and the defendant's "*corresponding duty* was the duty not to wrongfully deprive a person of spousal

19    companionship and affection." *Id.* at 798 (emphasis in original); *see also id.* at 804. Accordingly, the

20    plaintiff's second suit was barred by *res judicata*. *Id.* at 804.

21                                     **(iii) Different Primary Rights.**

22     In the following cases, the courts found that *res judicata* did not bar a subsequent cause of action

23    because it did not concern the same primary right involved in a prior case in which a final judgment on

24    the merits had entered.

25     In *Bullock*, the primary right that the plaintiff sought "to vindicate . . . [wa]s based on her

26

1   personal injuries." 198 Cal. App. 4th at 557. The court found that the plaintiff's primary right was

2   different from the primary right involved in a prior action brought by the California Attorney General

3   and the Director of California's Health Services that concerned only "economic injuries and injuries to

4   market competition." *Id.*

5          Similarly, in *Rothschild v. Tyco Int'l (US), Inc.*, 83 Cal. App. 4th 488, 499-500 (2000), the court

6   found that the plaintiff's claim brought under California's unfair competition law was not barred

7   because it involved primary rights distinct from those underlying a different plaintiff's claim against the

8   same defendants, even though both claims were "based on virtually identical factual allegations." *Id.* at

9   492. The court reasoned:

10      [The plaintiff] is not asserting a right held by herself or other individuals, but is acting on behalf
        of the government. Her action arises out of the defendants' wrongful conduct in misrepresenting
11      the nature of [the defendants'] products and submitting claims to the government for those
        products. By contrast, [the other plaintiff] asserts a wholly separate and distinct injury to herself
12      and other individuals similarly situated resulting from the defendants' use of inferior and
        substandard metals in hardware intended for use in the systems that supply their drinking water.
13
    *Id.* at 499-500.
14
15          In *Consumer Advocacy Group, Inc. v. ExxonMobil Corp.*, 168 Cal. App. 4th 675, 680 (2008), the

16   court found that a separate action did not bar the plaintiff's claim because the two actions did not

17   address identical issues. In the first case, the defendant reached a settlement with a different plaintiff

18   concerning the damages associated with the release of gasoline that contained benzene and toluene. *Id.*

19   at 688. The plaintiff, however, asserted a claim based on the defendant's alleged release of gasoline

20   containing benzene, toluene, *and* lead. *Id.* Accordingly, the court found that the plaintiff's claim was not

21   barred because the prior action "did not resolve claims relating to lead." *Id.*

22                    **(c) The City and Plaintiff Have Different Primary Rights.**

23          A review of the operative complaint in *City of Merced* and the FAC shows that the City and

24   Plaintiff allegedly suffered separate and distinct harms. In *City of Merced*, the City alleged that it "is the

25   owner and/or actual possessor of property rights and interests, easements, wells, the right to appropriate

26   and use groundwater, and water rights." *City of Merced* Compl. at ¶ 49. The City claimed that, due to

Defendants' actions, MTBE was released into its water supplies. *See id.* at ¶¶ 1-3. The City alleged that

it "will sustain substantially increased expenses incurred to remove MTBE, TBA, and/or other

constituents of gasoline from its water supplies, loss of the use of water and a threat to its appropriative

water rights." *Id.* at ¶ 34. The City sought damages to remediate "drinking water supplies, to secure

alternative supplies on an interim basis, to make associated changes to its operating systems and

practices, and for past, present, and future damage to [its] water system and water rights." *Id.* at ¶ 28.  In

sum, the City alleged that Defendants' conduct "would threaten public health and cause extensive

contamination of public drinking water supplies and property damage," *id.* at ¶ 35, and that "the

contamination and pollution of and threats to [the City's] water system from gasoline containing MTBE

and/or TBA is a public nuisance," *id.* at ¶ 55, which required the City to implement remediation

measures at a substantial cost.

The FAC's allegations, however, are limited primarily to the project area. Plaintiff asserts that

Defendants are

> legally responsible for the costs and damages relating to the present and abatement of gasoline,
> hydrocarbons, and MTBE located in or about the project area, which blight the project area,
> adversely impact the use of the project area, depreciate or stagnate property values, and
> adversely affect the interests of the health, safety, and welfare of the people.

FAC at ¶ 1. Plaintiff alleges that "[g]asoline containing MTBE and/or TBA has contaminated, polluted,

and threatened . . . [the] project area," and continues to do so. *Id.* at ¶ 3. Plaintiff alleges that, as a result

of Defendants' conduct, "the project area, including soil, groundwater, and improvements, has been

contaminated, and will continue to be contaminated with gasoline, hydrocarbons, MTBE, and TBE." *Id.*

at ¶ 34. Plaintiff claims Defendants "tamper[ed] with property owned and/or used by [Plaintiff] . . . to

provide water to its water customers . . . interfere[ed] with [Plaintiff's] vested water rights; and . . .

impair[ed] [Plaintiff's] right to appropriate water whose quality is not diminished." *Id.* at ¶ 53.

Plaintiff alleges it has incurred the following damages:

> loss of property, loss of tax revenues, property damage, restoration costs . . . delay damages,
> property devaluating, interim and permanent remedial measures to control releases and potential
> releases of gasoline, hydrocarbons, MTBE, and TBA, cleanup costs, potential installation and

1    maintenance of interceptor wells, and water treatment facilities.

2    *Id.* Plaintiff therefore allegedly incurred and will continue to incur "investigation, remediation, and

3    abatement costs and expenses required to restore the project area, and other damages." *Id.* at ¶ 54. In

4    sum, Plaintiff alleges Defendants' conduct negatively impacted its rights and interests in the project

5    area.

6          Defendants' arguments elsewhere in the record support the conclusion that the City's primary

7    right at issue in *City of Merced* is not the same as Plaintiff's primary right at issue here. According to

8    Defendants, "Defendants argued in the MDL that the City's and the RDA's injuries . . . were different."

9    Doc. 107 at 13. As Plaintiff points out, Defendants argued in the MDL court that

10         the City and the RDA were able to bring separate lawsuits only because they asserted
           fundamentally different claims. The City sought damages associated with the threat of MTBE
11         contamination to *its* municipal water wells and water system; the RDA sued defendants for
           contaminating *its* project area "with gasoline, hydrocarbons, and MTBE"; blighting *its* project
12         area; adversely impacting *its* use of the project area; depreciating property values; causing *it* to
           conduct environmental investigation, testing, and "abatement of gasoline, hydrocarbons, and
13         MTBE located in or about the project area"; and threatening *its* project area with MTBE from the
           R Street Stations. Because the RDA and the City . . . assert different claims, the [statute of]
14         limitations analysis is different for each of them. Third, even if the Court concluded that the
           finding in *City of Merced* had some applicability (which it should not), the actual finding is
15         extremely limited.

16   O'Reilly Decl., Ex. 4 at 1 (emphasis in original). Defendants further argued that the statute of limitations

17   applicable

18         to the City of Merced (whose claim was based on [a] threat to its drinking water wells a thousand
           feet up the street) is separate and distinct from the application of the statute of limitations to the
19         RDA (which bases its claims on a plume of gasoline in its project area, a lost sale and inability to
           use its property, and costs it incurred for remediation).
20
     O'Reilly Decl., Ex. 5 at 2.
21
           Thus, the primary right the City sought to vindicate in *City of Merced* was the right to have its
22
     water wells and water systems free from the threat of MTBE. Here, however, the primary right Plaintiff
23
     seeks to vindicate is the right to have the project area free from contamination by gasoline,
24
     hydrocarbons, and MTBE. The Court therefore finds that the City did not assert the same causes of
25
     action that Plaintiff asserts here.
26

                                                    27

To find otherwise essentially would require the Court to construe the City's and Plaintiff's respective primary right in their respective lawsuits as only the right to be free from Defendants creating a nuisance via the release of MTBE-containing gasoline at the R Street Stations. And to do so would require the Court to disregard the undisputed differences between the injuries the City and Plaintiff allegedly suffered. Even if Plaintiff sought damages associated only with the release of MTBE (as opposed to gasoline and hydrocarbons in addition to MTBE), the City and Plaintiff have different property interests and rights—the City has a property interest in its water supply systems; Plaintiff has a property interest in the project area—and both allegedly suffered injuries to those distinct interests and rights as a result of the release of MTBE at the R Street Stations.

In other words, the City's primary right at issue in *City of Merced* was the right to be free from a nuisance interfering with their rights to and use of their water supply system, and Plaintiff's primary right here is the right to be free from a nuisance interfering with their rights to and use of the project area. *See City of Stockton*, 643 F.3d at 672-73 (quoting Cal. Civ. Code § 3479).

This conclusion is supported by the law of nuisance in California, where a nuisance is something "injurious to health . . . or is indecent or offensive to the sense, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." *Id.* (quoting Cal. Civ. Code § 3479). Accordingly, the property right with which the alleged tortfeasor interfered defines, at least in part, the nuisance. Because the City and Plaintiff have distinct property rights impacted by Defendants' conduct, the nuisances that could be alleged by each differ to some degree. Likewise, the primary rights at stake differ. That Defendants' conduct allegedly infringed on both of those distinct rights is not dispositive. *See Agarwal*, 25 Cal.3d at 954 (in assessing the primary rights involved in separate actions, "that the same facts are involved in both suits is not conclusive"). Because *City of Merced* concerned a primary right of the City that is different from Plaintiff's primary right here, the MSJ Ruling has no *res judicata* effect in this case.

**b. Defendants Are Not "Responsible Parties" Under § 13304(a).**

Plaintiff argues Defendants are responsible parties under § 13304(a) because they assisted in the creation of a nuisance (*i.e.*, the release of MTBE-containing gasoline) at the R street stations.  Doc. 101 at 6. Plaintiff claims that Defendants

> exercised control over use of their product at the gasoline stations to which the product was delivered, purchased or financed the tanks in which the gasoline was stored and promoted and marketed MTBE while concealing from regulators, station operators and the public the dangers posed by MTBE . . . . Defendants, however, insisted that the R Street station operators sell their MTBE gasoline, in tanks that defendants knew to be inadequate to contain MTBE, without suggesting, much less demanding, that the changes the defendants themselves had implemented also be implemented at the R Street stations.

*Id.* at 6-7.

Defendants assert they are not "responsible parties" under § 13304(a) because they are not liable for creating a nuisance due to their involvement with the release of MTBE-containing gasoline at the R Street stations. *See* Doc. 80 at 17-18. The thrust of Defendants' argument is that they did not engage in any affirmative conduct that would subject them to liability for creating or assisting in the creation of a nuisance and, therefore, they cannot be liable as responsible parties under § 13304(a). *See id.*

The basis of Plaintiff's argument is that Defendants are liable for assisting in the creation of a nuisance at the R Street stations because they produced, sold, and provided the MTBE-containing gasoline that was released at the stations. *See* FAC at ¶¶ 3, 12; Doc. 101 at 22. Further, Plaintiff argues Defendants are liable because they

> knew the [USTs] at these stations were inadequate to contain the MTBE gasoline . . . defendants provided their customers (both the station owners and operators as well as jobbers) with MTBE handling instructions they knew were not only inadequate to prevent these releases, and that as a result of these inadequate instructions, MTBE gasoline was released from these stations . . . . Defendants, moreover, affirmatively promoted their MTBE products with full knowledge that MTBE was hazardous and likely to be released and cause contamination, and chose to hide what they knew about MTBE's risks from the public and those who handled their MTBE.

In summary, Plaintiff claims Defendants are "responsible parties" under § 13304(a) due to: (1) their producing and selling MTBE-containing gasoline to the owners/operators of the R Street stations; (2) their failing to adequately instruct those owners/operators on proper handling procedures for the

1    gasoline; and (3) their promoting MTBE in spite of its known dangers coupled with their failure to warn

2    about those dangers.

3         Under California law, Defendants' conduct is insufficient as a matter of law for nuisance liability

4    to attach. Even viewing the evidence in the light most favorable to Plaintiff, the Court finds that the

5    undisputed evidence shows that Defendants did not create or assist in the creation of a nuisance.

6         In *City of Modesto*, the court held that the defendants, whose conduct "was limited to

7    manufacturing or selling solvents to dry cleaners, with knowledge of the hazards of those substances,

8    without alerting the dry cleaners to proper methods of disposal," were not responsible parties under

9    § 13304(a) because they "merely placed solvents in the stream of commerce without warning adequately

10   of the dangers of improper disposal." 119 Cal. App. 4th at 42-43. The court held that those who "took

11   affirmative steps directed toward the improper discharge of [hazardous] wastes" could be held liable for

12   creating a nuisance whereas "those who merely placed [hazardous substances] in the stream of

13   commerce" could not. *Id.* at 42; *see also City of Stockton*, 643 F.3d at 674.

14        Likewise, in *Cnty. of Santa Clara v. Atlantic Richfield Co.*, 137 Cal. App. 4th 292 (2006)

15   ("*County of Santa Clara*"), the defendants, who manufactured lead paint, "could incur nuisance liability

16   for their 'intentional promotion of the use of lead paint on the interiors of buildings with knowledge of

17   the public health hazard that this would create,' but not for their 'mere manufacture and distribution of

18   lead paint or their failure to warn of its hazards.'" *City of Stockton*, 643 F.3d at 674 (quoting *County of*

19   *Santa Clara*, 137 Cal. App. 4th at 310) (footnote omitted). Thus, to the extent Plaintiff argues that

20   Defendants' selling their MTBE-containing gasoline or their failure to warn of the dangers associated

21   with MTBE subjects them to Polanco Act liability for the creation of a nuisance, the Court disagrees.

22   *See id.*; *City of Modesto*, 119 Cal. App. 4th at 42.

23        Here, Plaintiff does not allege that Defendants provided inadequate instructions pertaining to the

24   *disposal* of their MTBE-containing gasoline. Rather, Plaintiff asserts that Defendants provided allegedly

25   inadequate instructions pertaining to the *handling* of their MTBE-containing gasoline. In addition to *City*

26

1  *of Modesto*, Plaintiff relies on *Selma* and *County of Santa Clara* to support its argument that Defendants'

2  inadequate handling instructions are sufficient to subject them to Polanco Act liability. *See* Doc. 101 at

3  20-21.

4         Defendants' allegedly inadequate handling instructions do not subject them to nuisance liability.

5  The court in *City of Modesto* held that "defendants who manufactured equipment designed to discharge

6  waste in a manner that will create a nuisance, or who specifically instructed a user *to dispose of wastes*

7  *in such a manner*, could be found to have caused or permitted a discharge," and therefore could be liable

8  for a Polanco Act claim. 119 Cal. App. 4th at 42 (emphasis added). In that case, for example, the

9  plaintiff claimed that "with knowledge of the hazards involved, some of the defendants instructed . . .

10  dry cleaners to set up their equipment to discharge solvent-containing wastewater into the drains and

11  sewers, and that others gave dry cleaners instructions to dispose of spilled [hazardous substances] on or

12  in the ground." *Id.* at 41. The court held that "these kinds of affirmative acts or instructions could

13  support a finding that those defendants assisted in creating a nuisance." *Id.* But the court held, however,

14  that defendants who put hazardous substances "in the stream of commerce without warning adequately

15  of the dangers of improper disposal are not liable under [§ 13304(a)]." *Id.* at 43. Thus, the court in *City*

16  *of Modesto* held that the defendants who only manufactured or distributed the cleaning solvent at issue

17  were not liable under the Polanco Act, but the defendants who had installed systems that improperly

18  discharged the solvent or who had instructed the dry cleaners to improperly discharge the solvent could

19  be liable. *See id.* at 41-42.

20         *County of Santa Clara* involved "conduct . . . distinct from and far more egregious than simply

21  producing a defective product or failing to warn of a defective product." 137 Cal. App. 4th at 309. In

22  that case, the plaintiffs alleged that the defendants, manufacturers of lead paint, were liable for creating a

23  nuisance

24      by concealing the dangers of lead, mounting a campaign against regulation of lead, and
    promoting lead paint for interior use even though defendants had known for nearly a century that

25      such a use of lead paint was hazardous to human beings. Defendants "[e]ngag[ed] in a massive
    campaign to promote the use of Lead on the interiors and exteriors of private residences and

26

public and private buildings and for use on furniture and toys."

*Id.* at 325.

Accordingly, "the alleged basis for defendants' liability for the public nuisance created by lead paint [wa]s their affirmative promotion of lead paint for interior use, not their mere manufacture and distribution of lead paint or their failure to warn of its hazards." *Id.* at 310. The defendants "promoted lead paint for interior use and claimed that it was safe." *Id.* at 321. The court therefore characterized the conduct at issue in *County of Santa Clara* as "similar to instructing the purchaser [of a product] to use the product in a hazardous manner." *Id.* at 325. The court found that the plaintiffs adequately stated a claim against the defendants for creating a nuisance due to their "*promotion of lead paint for interior use* with knowledge of the hazard that such use would create." *Id.* (emphasis in original).[12]

Plaintiff does not assert Defendants instructed purchasers of its MTBE-containing gasoline to *use* it in a hazardous manner. Nor does Plaintiff allege that Defendants affirmatively promoted any such *use*. *County of Santa Clara* therefore does not support Plaintiff's Polanco Act claim.

*Selma* is distinguishable as well. In that case, the court found that the defendants could be liable for creating or assisting in the creation of a nuisance. *Selma*, 221 Cal. App. 3d at 1620. The court in *City of Modesto* summarized *Selma* as follows:

There, [the State] sued the defendants, operators of a wood treatment facility, alleging they improperly disposed of hazardous waste and seeking, among other things, damages flowing from a nuisance. The defendants cross-complained, seeking equitable indemnity from several cross-defendants. One was a company that designed the wood treatment technique, installed cross-complainants' equipment, provided training and made recommendations on operating policies that resulted in wood-treating chemicals being deposited into soil overlying an aquifer. Other cross-defendants included chemical suppliers that provided "assistance and advice" and knew or should have known of the potential health threats posed by improper use or disposal of the chemicals, but failed to warn of those risks.

The Court of Appeal concluded the cross-complainants had pled, or could plead, facts showing the cross-defendants might be liable for the nuisance—specifically, that the installer of

---

[12] The court in *County of Santa Clara* found this conduct to be sufficiently distinct from the conduct at issue in *City of Modesto*, and therefore explicitly concluded that *City of Modesto* was distinguishable. *See* 137 Cal. App. 4th at 309. The court further found that *City of Modesto* was distinguishable because the plaintiffs in *County of Santa Clara* were "*not seeking damages* for injury to *their* property or the cost of remediation *their* property." *Id.* (emphasis in original).

the equipment recommended creation of an unlined dirt pond for disposing of the waste products; that it knew or should have known that such disposal could threaten the safety of the water supply; that the cross-complainants did not know of the danger; and that the installer failed to warn of that danger. The court reasoned that this kind of *direct involvement in the design and installation of the disposal system*, coupled with the installer's knowledge and the user's lack of knowledge of the dangers, could support a finding that the designer/installer created or assisted in the creation of a nuisance.

The involvement of the chemical companies was less direct, but the court concluded they, too, could be held liable. The cross-complaint alleged: as direct purchasers of the chemicals, the owners (cross-complainants) were foreseeable users; disposal of the chemical residue was a foreseeable use of the product; the chemical companies knew or should have known of the dangers of improper disposal of the chemicals; the owners did not know of those dangers; the companies failed to warn of the dangers; and that failure to warn was a substantial factor in causing the damage

119 Cal. App. 4th at 40 (emphasis added).

Plaintiff suggests that *Selma* supports their position that Defendants are liable for assisting in the creation of a nuisance due to their failure to provide adequate instructions concerning the use and handling of their MTBE-containing gas. *See* Doc. 101 at 20. Specifically, Plaintiff relies on the following language from *Selma*:

[I]f we can say improper disposal or storage of the chemicals was the likely consequence of the chemical supplier's failure to warn . . . we find that, in failing to warn an unknowledgeable [customer] of the hazards to the environment which [the chemical manufacturers and distributors] knew could flow from the improper handling and disposal of the wood treating chemicals, their failure could be found to be a substantial factor in the creation of the nuisance.

*Id.* (quoting *Selma*, 221 Cal. App. 3d at 1624).

The court in *City of Modesto* explained this holding and *Selma*'s relevant procedural history as follows:

The *Selma* court's reasoning in holding the supplier-defendants potentially liable is not entirely clear. As noted, in *Selma* the state sued the defendants who discharged hazardous waste alleging a cause of action for nuisance. The defendants cross-complained against their codefendants— among them, their chemical suppliers—for equitable indemnity . . . . Recognizing that an equitable indemnity claim requires the cross-defendants to have potential joint and several liability to the plaintiff, the Court of Appeal posed the question "whether the pleadings adequately plead . . . facts which suggest . . . the chemical suppliers created or assisted in the creation of the nuisance here." . . . . However, in answering the question, and holding cross-complainants could state a claim against the chemical suppliers, the court relied solely upon a classic negligence/failure to warn theory. . . . We therefore read *Selma* to mean that a defendant sued in nuisance and subjected to liability for nuisance damages, may cross-complain against codefendants or third parties under other appropriate theories, such as products liability or failure to warn. If *Selma* is interpreted as holding that one who merely supplies a product and fails to warn of the hazards of improper disposal can be liable under the law of nuisance, we would

33

1    disagree with it.

2    119 Cal. App. 4th at 42 n.9. Thus, as the court in *City of Modesto* explained, a claim premised on a

3    defendant's failure to warn of the risks associated with the disposal of its product "does not fall within

4    the context of nuisance, but is better analyzed through the law of negligence or products liability." *Id.* at

5    42.

6          The court in *City of Modesto* read *Selma* to stand for two primary propositions. First, "those who

7    create or assist in creating a system that causes hazardous wastes to be disposed of improperly, or who

8    instruct users to dispose of wastes improperly, can be liable under the law of nuisance." *Id.* at 40-41.

9    Second, "defendants who fail to warn of the dangers of improper disposal of hazardous materials but

10   give no guidance or instructions pertaining to that disposal" may be liable for assisting in the creation of

11   a nuisance. *Id.* at 42. The court did not mention  *Selma*'s discussion of the relevance, if any, of a

12   defendant-manufacturer's alleged failure to warn users about the proper use and handling of its product.

13   Thus, *Selma* does not support Plaintiff's position that Defendants' alleged failure to provide warnings

14   about the proper use and handling—but not *disposal*—of their MTBE-containing gasoline, without

15   more, supports a finding that Defendants are liable for creating or assisting in the creation of a nuisance.

16         *Selma* therefore does not support Plaintiff's position because Plaintiff does not assert that

17   Defendants were involved in the design or installation of a disposal system at the R Street stations, nor

18   does Plaintiff assert that Defendants gave affirmative instructions on how to *dispose* of their MTBE-

19   containing gasoline. Nor is Plaintiff pursuing its nuisance claim against Defendants based on a theory

20   that they failed to provide guidance or instructions on the proper *disposal* of their MTBE-containing

21   gasoline. To the extent Plaintiff argues that Defendants are liable for nuisance for failing to warn about

22   the dangers inherent with the use and handling of their MTBE-containing gasoline, the Court disagrees.

23   *See id.* at 42, 42 n.9.

24         *Team Enterprises*, 647 F.3d 901, which Plaintiff does not address, *see* Docs. 93 at 4, 101 at 4,

25   also does not support its position. In that case, the plaintiff brought suit against the defendant for, among

26

34

1   other things, assisting in the creation of a nuisance. *Team Enterprises*, 647 F.3d at 911. The plaintiff

2   operated a dry cleaning store where it used a hazardous substance ("PCE"). *Id.* at 906. The defendant's

3   "dry cleaning machines used PCE as part of the cleaning process, thereby generating wastewater

4   containing the chemical." *Id.* Those machines would "recycle the PCE-laden wastewater for reuse" and

5   "deposited the resulting wastewater into an open bucket." *Id.* The plaintiff disposed that wastewater by

6   pouring it down sewer drains, which caused contamination that the plaintiff ultimately was required to

7   clean up at its own expense. *Id.* This Court granted the defendant's motion for summary judgment on the

8   plaintiff's nuisance claims on the ground the defendant's conduct did not subject it to nuisance liability.

9   *See Team Enterprises, LLC v. Western Invest. Real Estate Trust*, No. 08-cv-0872-LJO-SMS, 2010 WL

10  3133195, at *14-17 (E.D. Cal. Aug. 9, 2010).

11          On appeal, the Ninth Circuit affirmed. *See Team Enterprises*, 647 F.3d at 912. The court

12  observed that the plaintiff "presented evidence that [the defendant] instructed it to pour wastewater

13  containing PCE into a bucket." *Id.* But the court held that the defendant was not liable for assisting in

14  the creation of a nuisance because "there [was] no evidence in the record that [the defendant] "instructed

15  'the dry cleaners to set up their equipment to discharge solvent-containing wastewater into the drains

16  and sewers,' or that [the defendant] 'gave dry cleaners instructions to dispose of spilled [PCE] on or in

17  the ground.'" *Id.* (quoting *City of Modesto*, 119 Cal. App. 4th at 41).

18          As the Ninth Circuit succinctly summarized in *Team Enterprises*, a defendant may be liable for

19  creating or assisting in the creation of a nuisance[13] under California law if it "either (1) affirmatively

20  instructs the polluting entity to dispose of hazardous substances in an improper or unlawful manner, *see*

21  *City of Modesto*, 13 Cal.Rptr.3d at 874-75, or (2) manufactures or installs the disposal system, *see Selma*

22  *Pressure Treating*, 271 Cal.Rptr. at 607." 647 F.3d at 912.[14] Here, the undisputed evidence, even when

_____

24  [13] There are two other ways in which a defendant may be liable under California law for nuisance; however, neither applies
here. *See Coppola v. Smith*, 935 F. Supp. 2d 993, 1018-19 (E.D. Cal. 2013).

25  [14] Notably, in announcing this standard, the Ninth Circuit did not address nor discuss *County of Santa Clara*. *See Team*
26  *Enterprises*, 647 F.3d at 911-12. That case is only mentioned in the court's discussion of the law of trespass in California. *See*

1   viewed in the light most favorable to Plaintiff, demonstrates that Defendants did neither. Accordingly,

2   they are not liable for creating or assisting in the creation of a nuisance at the R Street stations. As such,

3   they are not responsible parties under § 13304(a).

4           **c. Defendants Are Not "Arrangers" Under § 9607(a)(3) of
                CERCLA.**

5           Plaintiff maintains that Defendants are "arrangers," as contemplated by § 9607(a)(3), because

6   "[t]he MTBE released from [USTs] through spills and leaks at the R Street stations" constitute

7   "disposal" under CERCLA. *See* Doc. 116 at 2, 3 n.2 Plaintiff asserts Defendants are "arrangers" under §

8   9607(a)(3) for two primary, interrelated reasons. First, Plaintiff claims that the determination of whether

9   Defendants are subject to arranger liability under § 9607(a)(3) is a "case-specific, fact-intensive inquiry

10  which should not be resolved on summary judgment." *Id.* at 4. Second, Plaintiff maintains that "there are

11  numerous disputed issues of fact concerning whether defendants could and should have acted to 'reduce

12  the likelihood of . . . spills' of MTBE from [USTs]." *Id.* at 5-6.

13          The thrust of Plaintiff's argument is that Defendants knew that MTBE-containing gas would be

14  released at the R Street stations (and elsewhere) yet they purposefully and intentionally did not take

15  steps to reduce or minimize the releases. Plaintiff asserts that Defendants "not only knew that [USTs] at

16  retail gasoline stations inevitably leaked, but were also aware that additional actions were needed to

17  'reduce the likelihood' of harmful releases of MTBE," which Defendants knew "would lead to

18  substantial contamination of groundwater and drinking water wells." *Id.* at 6-7. In summary, Plaintiff

19  claims Defendants "had a long history of 'purposeful inaction' in providing appropriate information on

20  the storage and handling of MTBE which would 'reduce the likelihood' of spills, releases, and leaks that

21  would lead to MTBE contamination." *Id.* at 7.

22          Defendants assert that they are not CERCLA arrangers because they sold a new, useful product

23  (*i.e.*, MTBE-containing gasoline) and did not intend to dispose of a hazardous substance when selling

24

25  _____

26  *id.* at 912-13.

1    that product.[15] Doc. 117 at 6. Thus, Defendants argue Plaintiff's claim is barred under the so-called

2    "useful product doctrine." *Id.*

3        To the extent Plaintiff argues that the Court cannot resolve the issue of whether Defendants are

4    "arrangers" under CERCLA on a motion for summary judgment, its argument lacks support. In fact,

5    *Team Enterprises* directly contradicts Plaintiff's assertion: the Ninth Circuit affirmed this Court's grant

6    of summary judgment in the defendants' favor on the plaintiff's claim that the defendants were

7    "arrangers" under CERCLA. *See* 647 F.3d at 910-11.

8        Tellingly, Plaintiff does not mention (much less address) CERCLA's intent requirement for

9    arranger liability. *See generally* Doc. 116 at 6-10. Although Plaintiff discusses *Burlington*, Plaintiff does

10   not address its holding most critical to this case: a defendant's knowledge that spills and leaks of a

11   hazardous substance occurred (or will continue to occur) is insufficient to find that the defendant

12   "'arranged for' the disposal of [a hazardous substance] within the meaning of § 9607(a)(3)." 556 U.S. at

13   612.

14       As the Ninth Circuit explained in *Team Enterprises*, under *Burlington*, a defendant "may not be

15   held liable as an arranger under CERCLA unless the plaintiff proves that the company entered into the

16   relevant transaction *with the specific purpose* of disposing of a hazardous substance." 647 F.3d at 909

17   (emphasis in original). Plaintiff does not (and cannot) dispute that the purpose of Defendants' legitimate

18   sales of their MTBE-containing gasoline was to sell gasoline, not to dispose of MTBE. Likewise,

19   Plaintiff does not (and cannot) argue that the gasoline Defendants sold was "waste" as contemplated by

20   CERCLA. Even viewing the evidence in the light most favorable to Plaintiff, there simply is no

21   evidence that the specific purpose of Defendants' gasoline sales was to dispose of MTBE, and "the

22   presumption . . . that people sell useful products for legitimate business purposes, not for the purpose of

23

24   _____

     [15] Defendants also argue that they are not CERCLA arrangers because gasoline does not constitute a hazardous substance

25   under CERCLA. *See* Doc. 117 at 14. The Court need not—and does not—address that issue. Similarly, Defendants assert
     they are not CERCLA arrangers for the additional reason that they did not control any alleged "disposal" at the R Street

26   stations, *id.* at 10, but the Court need not address that issue.

1  disposing of waste . . . is applicable to this case." *Id.* Rather, the evidence indicates that, although MTBE

2  was released at the R Street stations, it occurred "as a peripheral result of the legitimate sale of an

3  unused, useful product." *Burlington*, 556 U.S. at 612.

4        Plaintiff emphasizes that a reasonable fact-finder could find that Defendants are CERCLA

5  arrangers because they allegedly knew that it was inevitable their MTBE-containing gasoline would be

6  spilled, leaked, or released onto third-party sites, yet they failed to take appropriate preventative and

7  remedial measures and failed to provide "appropriate information on the storage and handling of

8  MTBE" to the purchasers at the R Street stations. *See* Doc. 116 at 6-7.[16] Thus, Plaintiff implies that

9  Defendants' "purposeful inaction" shows that they are CERCLA arrangers, *i.e.*, that they intended to

10  dispose of MTBE through their gasoline sales.

11        Plaintiff essentially argues that Defendants' failure to warn purchasers at the R Street stations

12  about the risks associated with MTBE storage subjects them to CERCLA arranger liability. Plaintiff

13  provides no support for the argument. *See* Doc. 116 at 7-8. Although not entirely on point, *Team*

14  *Enterprises* is instructive here. In that case, the Ninth Circuit rejected the plaintiff's urging the court "to

15  infer intent from [the defendant's] failure to warn [the plaintiff] about the risk of contamination that

16  would result from improper disposal." *Team Enterprises*, 647 F.3d at 909. The court was "unpersuaded

17  that CERCLA liability extends so far." *Id.* The court reasoned:

18      But allowing intent to be inferred from a mere failure to warn would greatly expand the scope of
    arranger liability. For example, a plaintiff would have a viable CERCLA claim against an auto

19      manufacturer that failed to warn purchasers that motor oil must be disposed of properly once it
    has outlived its usefulness. Countless other manufacturers would also be subject to arranger

20      liability under [the plaintiff's] novel theory . . . . While a manufacturer who fails to warn the
    buyer about a product's inherent risk might be subject to a products-liability claim, we are not

21      convinced that sellers of useful products must instruct buyers on proper disposal techniques in
    order to avoid CERCLA liability.

22  *Id.* Given the Ninth Circuit's holding that CERCLA liability does not extend to a defendant who fails to

23

24  _____

25  [16] Defendants dispute the veracity of these assertions. *See* Doc. 117 at 7 n.2. Defendants argue "there is no evidence that any Defendant knew of the likelihood of an accidental release at one of the R Street Stations." *Id.* Regardless, the Court agrees with Defendants that the "Court need not resolve this dispute here because, even if true, these supposed facts would be insufficient for arranger liability." *Id.*

26

warn its clients about proper disposal techniques, it follows that CERCLA liability does not attach to a

defendant who fails to warn its clients about proper storage techniques. To find otherwise would

"greatly expand the scope of arranger liability" because it would impose a duty on manufacturers to

instruct their clients on storage techniques in order to avoid CERCLA liability. The Court is unaware

of—and Plaintiff does not provide—any authority suggesting that such a duty exists.

Plaintiff is correct, however, that a defendant's actions and inactions may evince an intent to

dispose of a hazardous substance through an otherwise legitimate business transaction, thereby

subjecting the defendant to CERCLA arranger liability. *See Burlington*, 556 U.S. at 612. For instance, in

*United States v. Gen. Elec. Co.*, 670 F.3d 377 (1st Cir. 2012), a case on which Plaintiff heavily relies,

the First Circuit held that "the defendant . . . attempted to dispose of excess waste products through the

guise of a legitimate transaction." *Vine Street*, 2015 WL 178981, at *5. In that case

> an alleged arranger had accumulated a glut of a scrap material, low-quality Pyranol, that it sold at
> bargain prices to a manufacturer that intended to use the scraps as a paint additive. The
> manufacturer missed payments on the scrap material, but the arranger continued to send supplies
> of the scrap material. The First Circuit concluded that the scrap Pyranol was not a useful product
> because there was no evidence that the arranger viewed the product as having value or marketed
> it as valuable. The court also emphasized the suspicious facts in that case, where the
> manufacturer received unsolicited increases of the Pyranol and received such shipments even
> after regularly missing payments.

*Id.* (citations omitted). In other words, although the sales at issue in *General Electric* were seemingly

legitimate business transactions, they were properly viewed as disposals of waste that triggered

CERCLA arranger liability. *See NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 705 (7th

Cir. 2014) (noting that the court in *General Electric* found that "the material [at issue in that case] . . .

was waste for disposal, regardless of whether the [buyer] paid a nominal fee").

"While actions taken with the *intent* to dispose of a hazardous substance are sufficient for

arranger liability, actions taken with the mere *knowledge* of such future disposals are not." *Team

Enterprises*, 647 F.3d at 908 (emphasis in original). In *Team Enterprises*, for instance, the Ninth Circuit

held that the defendants' sale of a machine used in the dry cleaning process, which, when used,

generated a hazardous substance, was not a CERCLA arranger because the *purpose* of the defendants'

1    sales of the machine was not to dispose of the hazardous substance, but rather to sell the machine itself.

2    Similarly, in *Vine Street*, the Fifth Circuit, discussing *Team Enterprises*, held that the defendant was not

3    a CERCLA arranger because "[i]t did not intend to *dispose* of" a hazardous substance through the sale

4    of its dry cleaning machines. 2015 WL 178981, at \*6 (emphasis in original).

5            Here, even viewing the light most favorable to the Plaintiff, there is no evidence that Defendants'

6    sale of their MTBE-containing gasoline—an indisputably legitimate business transaction—was a guise

7    to dispose of MTBE. Because there is no evidence that Defendants *intended to dispose* of MTBE

8    through the sale of its gasoline, the Court "must conclude that [Defendants] lack[] the requisite intent for

9    arranger liability." *Team Enterprises*, 647 F.3d at 909. Accordingly, the Court GRANTS Defendants'

10   motion for summary judgment on Plaintiff's Polanco Act claim to the extent the claim asserts

11   Defendants are liable as CERCLA arrangers.

12   **C.      The Remainder of the Parties' Motions for Summary Judgment Are Moot.**

13           For the foregoing reasons, Defendants are not responsible parties under the Polanco Act. As

14   such, they are entitled to summary judgment on Plaintiff's Polanco Act claim. Accordingly, the Court

15   finds that the remaining issues in the parties' motions for summary judgment are MOOT and does not

16   address them.

17                           **V. CONCLUSION AND ORDER**

18           For the foregoing reasons, the Court finds that, based on the undisputed evidence and viewing

19   that evidence in the light most favorable to Plaintiff, Defendants are not responsible parties under the

20   Polanco Act. Thus, Plaintiff's Polanco Act claim fails. Accordingly, the Court

21           1.      GRANTS IN PART Defendants' motion for summary judgment (Doc. 82) on Plaintiff's

22                   Polanco Act claim in favor of Defendants and against Plaintiff. Specifically, the Court

23                   GRANTS Defendants' motion for summary judgment that they are not responsible

24                   parties under the Polanco Act, either under § 13304(a) or § 9607(a)(3);

25           2.      DENIES AS MOOT the remainder of the parties' motions for summary judgment;

26

                                             40

1        3.       VACATES all pending deadlines in this case; and

2        3.       DIRECTS the Clerk of Court to CLOSE this case.

3    IT IS SO ORDERED.

4    Dated:   **February 4, 2015**           **/s/ Lawrence J. O'Neill**
                                                UNITED STATES DISTRICT JUDGE